UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BRENT JARRELL, ET AL | CIVIL ACTION |
| VERSUS | NO. 16-13793 |
| INTERNATIONAL PAPER COMPANY, ET AL | SECTION "L" (1) |
| DERRICK JEVONE SANDERS, ET AL | CIVIL ACTION |
| VERSUS | NO. 16-12567 |
| INTERNATIONAL PAPER COMPANY, ET AL | SECTION "L" (1) |
| SHIRLEY SLOCUM, ET AL | CIVIL ACTION |
| VERSUS | NO. 16-12563 |
| INTERNATIONAL PAPER COMPANY, ET AL | SECTION "L" (1) |

**INTERNATIONAL PAPER COMPANY'S MEMORANDUM
IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

NOW COMES, through undersigned counsel, Defendant, International Paper Company ("IP"), who respectfully submits this Memorandum in Opposition to Plaintiffs' Motion for Class Certification. (No. 16-12563, at R. Doc. 182).[1]

IP does not oppose class certification of those issues that are truly class-wide issues in this litigation. Rather IP files this Opposition because it opposes class treatment of certain issues and the class area advanced by Plaintiffs. Specifically, IP disagrees that Rule 23(c)(4) contemplates certification of hyperspecific disputed facts or that general causation is a class-wide issue in this litigation. IP's proposed bifurcated trial plan, rather than that submitted of Plaintiffs, would allow

---

[1] An identical Motion for Class Certification was filed in each of three pending captioned litigations as well as the now closed, but related, *Bolton* litigation. *See* No. 16-12567, at R. Doc. No. 119; No. 16-13793, at R. Doc. No. 129; and No. 16-13346, at R. Doc. 83. This Opposition is being filed in response to each Motion.

for certification of "particular issues" as contemplated by Rule 23(c)(4) and without interfering with any party's Seventh Amendment rights to a jury trial on any issue.

## I.      FACTUAL BACKGROUND AND PROCEDURAL POSTURE

It is undisputed that, on June 10, 2015, there was an accidental discharge of black liquor through a sight glass located at the top of the dome of the third effect evaporator tank at IP's Bogalusa, Louisiana paper mill (the "Release Event"). The Release Event occurred when a sight glass unexpectedly failed. The Release Event lasted just under 40 minutes. *See* Exhibit A, Stipulation of IP.

In June 2016, certain named plaintiffs commenced the above-captioned lawsuits asserting claims arising out of the Release Event as individual class actions against IP in the Parish of Washington, 22nd Judicial District, State of Louisiana. *See* No. 16-12563, at R. Doc. No. 1-2; No. 16-12567, at R. Doc. No. 1-2; and No. 16-13793, at R. Doc. No. 1-2. IP removed each lawsuit to this Court pursuant to its jurisdiction under the Class Action Fairness Act of 2005.

Plaintiffs allege that they sustained damages to their persons and/or property as a result of the Release Event. *See* No. 16-12563, at R. Doc. No. 1-2, at ¶¶ 67, 72-78; No. 16-12567, at R. Doc. No. 1-2, at ¶¶ 70, 75-81; and No. 16-13793, at R. Doc. No. 1-2, at ¶¶ 67, 72-78. Plaintiffs bring claims against IP for negligence, strict liability (under Louisiana Civil Code Articles 2317, 2317.1, and 667)[2], and nuisance.[3] *See* No. 16-12563, at R. Doc. No. 1-2, at ¶ 109; No. 16-12567, at R. Doc. No. 1-2, at ¶ 105; and No. 16-13793, at R. Doc. No. 1-2, at ¶ 98.

---

[2] On November 4, 2016, the Court dismissed Plaintiffs' claims for strict liability nuisance under Articles 667. *See* 16-12563, R. Doc. 30; 16-12567, R. Doc. 26; 16-13793, R. Doc. 24.
[3] IP assumes Plaintiffs have abandoned their claim for injunctive relief. Nevertheless, here much like in *Paternostro*, their purported claim for injunctive relief cannot be certified for class treatment under Rule 23(b)(2). *Paternostro v. Choice Hotel Int'l Servs. Corp.*, 309 F.R.D. 397, 402-403 (E.D. La. 2015).

Plaintiffs seek to recover pecuniary and nonpecuniary damages for the injuries they have allegedly sustained as well as for ongoing distress and injuries they believe they may incur in the future. *See* No. 16-12563, at R. Doc. No. 1-2, at ¶ 113; No. 16-12567, at R. Doc. No. 1-2, at ¶ 109; and No. 16-13793, at R. Doc. No. 1-2, at ¶ 102.

Currently, this matter is set for trial on November 12, 2019. *See* No. 16-12563, at R. Doc. No. 168; No. 16-12567, at R. Doc. No. 110; and No. 16-13793, at R. Doc. No. 120.

## II.   LEGAL STANDARD FOR CLASS CERTIFICATION OF PARTICULAR ISSUES

Rule 23 of the Federal Rules of Civil Procedure governs class actions in federal court. Parties seeking class certification must first satisfy the following prerequisites of Rule 23(a):

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Once the prerequisites of Rule 23(a) are satisfied, the parties seeking certification must then show that the action is maintainable under either Rule 23(b)(1), (2), or (3). Under Rule 23(b)(3), the proposed class must satisfy the predominance and superiority requirements by demonstrating to the court that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Read together, "Rule 23(a) and 23(b)(3) provide six requirements for a group of claims to be certified as a class action—numerosity, commonality, typicality, adequacy of representation, predominance, and superiority." *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 603 (E.D. La. 2006).

In certain instances, some but not all issues within a claim may be well-suited for class resolution. In those cases, the court may certify only those particular issues instead of the entire claim pursuant to Rule 23(c)(4). For example, in a claim for negligence, the issue of liability may be appropriate for class treatment, but the issues of causation and damages owed to each plaintiff may not. Under Rule 23(c)(4), therefore, the court could certify just the issue of liability for class treatment. The issues of causation and damages would then be handled separately for each plaintiff.

Rule 23(c)(4), however, "is not a stand-alone clause" and "i[t] does not permit plaintiffs to ignore the requirements of 23(a) or (b)." *Paternostro v. Choice Hotel Intern. Servs. Corp.*, 309 F.R.D. 397, 405 (E.D. La. 2015). Particular issues can be certified only after the cause of action as a whole satisfies the predominance requirement of Rule 23(b)(3). *In re Vioxx Prod. Liab. Litig.,* 239 F.R.D. 450, 462 (E.D. La. 2006) (disallowing "creative use of bifurcation" to sever individual causation and damages issues because the "cause of action, as a whole, must satisfy the predominance requirement of (b)(3)"); *see also In re Katrina Canal Breaches Consol. Litig.,* No. CIV A 05–4182, 2007 WL 2363135, at *1 (E.D. La. Aug. 16, 2007) ("Rule 23(c)(4) issue certification is allowed *only* if the Rule 23(b) requirements are first met as to the claim and the court has done a searching analysis of plaintiffs' cause of action as a whole . . . ."). "The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial." *Castano v. American Tobacco Company,* 84 F.3d 734, 745 n. 21 (5th Cir. 1996).

III.    **PLAINTIFFS' LEGAL CLAIMS**

Plaintiffs specifically assert the following causes of action against IP: negligence, strict liability, and nuisance. *See* No. 16-12563, at R. Doc. No. 1-2, at ¶ 109; No. 16-12567, at R. Doc. 1-2, at ¶105; and No. 16-13793, at R. Doc. No. 1-2, at ¶ 98. The legal issues making up each cause of action are discussed in turn below.

A.      *Negligence*

All of the approximately 2,300 claimants making claims arising out of the Release Event allege that IP was negligent pursuant to Louisiana Civil Code Article 2315. In Louisiana, courts employ a duty-risk analysis to determine the potential negligence of a defendant.  *Long v. State Dept. of Trans. & Dev.,* 2004–0485 (La. 6/29/05), 916 So.2d 87, 101. The duty-risk analysis involves five separate elements of proof: (1) proof the defendant had a duty to conform its conduct to a specific standard of care (the duty element); (2) proof that the defendant's conduct failed to conform to that standard (the breach element); (3) proof that the defendant's conduct was cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's conduct was legal cause of the plaintiff's injuries (the scope of liability element); and, (5) proof of actual damages (the damages element). *Mathieu v. Imperial Toy Corporation*, 646 So.2d 318, 322 (La. 1994).

Some of these elements focus solely on the class-wide issue of IP'S alleged conduct—whether IP owed a duty to Plaintiffs, whether that duty was breached, and whether IP's duty encompassed protecting Plaintiffs from the types harms alleged (elements 1, 2, and 4). The class-wide issues relating to IP's duty, if any, to Plaintiffs, the scope of that duty, and whether that duty was breached do not require the type of extensive individualized proof that would preclude class treatment. Other elements require individualized inquiries for each Plaintiff, such as whether the

black liquor released during the Release Event could have been and was the cause-in-fact of the various types of injuries Plaintiffs allege and whether each Plaintiff has sustained actual and recoverable damages (elements 3 and 5).

**B.      *Strict Liability***

As with negligence, all claimants have advanced strict liability as a theory of recovery. Louisiana Civil Code article 2317 provides that a person is liable for damages caused by a thing within the person's custody or *garde.* The Louisiana Supreme Court has interpreted this article to provide a form of strict liability. *Loescher v. Parr,* 324 So.2d 441, 446 (La.1975). Louisiana Civil Code article 2317.1, however, limits article 2317, and provides that the owner or custodian of a thing is answerable for damage only if: (1) the defendant knew, or should have known, of the ruin, vice or defect in the thing; (2) the damage could have been prevented by exercise of reasonable care; and (3) the defendant failed to exercise reasonable care.

Here, as with negligence, the elements of strict liability that focus entirely on IP's conduct and require no individualized inquiry would pertain to the entire class. But whether any Plaintiff sustained actual and recoverable damages as a result of the Release Event and the amount of damages, if any, owed to each Plaintiff, are issues that would need to be decided on an individual basis. *Turner v. Murphy Oil USA, Inc.,* 234 F.R.D. 597, 609 (E.D. La. 2006).

**C.      *Nuisance***

Approximately 420 claimants are bringing a nuisance claim in the referenced cases. Louisiana Civil Code Article 667 provides "[a]lthough a proprietor may do with his estate whatever he pleases, still he cannot make any *work* on it, which may deprive his *neighbor* of the liberty of enjoying his own, or which may be the cause of any damage to him." La. Civ. Code art. 667 (emphasis added). Based on the review of the claimant forms submitted in this matter, it

appears the majority of Plaintiffs complain of personal injuries as they were driving through an area affected by the release. Many of the claimants, including those claiming the release affected their immovable property, will not be able to establish that they are "neighbors" of the Mill, which is a prerequisite for bringing a claim for nuisance. This is an issue each Plaintiff will need to establish individually.

Once a plaintiff establishes that his or her claim falls under article 667, to prevail, he or she must prove: (1) an activity of the defendant, (2) that caused damage to a plaintiff's property, and (3) that defendant knew or should have known the activity would cause damage, (4) the damage could have been prevented by the exercise of reasonable care, and (5) defendant failed to exercise reasonable care. La. Civ. Code art. 667. Also, under article 667, the trier of fact must determine how much of an inconvenience a plaintiff must tolerate without redress, in reference to factors like the character of the locality, the nature and degree of the intrusion, and the effect of the activity on the health and safety of neighbors. *Parish of East Feliciana v. Guidry,* 2004–1197 (La. App. 1st Cir. 8/10/05), 923 So.2d 45, 52–53.

Setting aside that each Plaintiff asserting a nuisance claim would first need to establish him or herself as a neighbor of the Mill to pursue a claim under article 667, there are particular issues related to IP's conduct under this claim that pertain to the class as whole. For instance, whether the alleged property damages arose out of "work" at the Mill, and, whether IP exercised reasonable care are issues that could be certified on a class-wide basis. However, as with their other claims, to prevail under article 667, each Plaintiff would need to individually prove whether he or she sustained recoverable damages as a result of the Release Event and the amount of damages, if any, owed to each Plaintiff.

## IV.  <u>CLASS CERTIFICATION OF PARTICULAR ISSUES</u>

IP agrees that the Rule 23(a) requirements of numerosity, commonality, typicality and adequacy are satisfied as to certain particular issues underlying each cause of action.[4]

However, to prevail on his or her claims, regardless of the legal theory of recovery, each Plaintiff must prove individualized injury caused in fact by the Release Event. Such evidence must show: (1) actual exposure of Plaintiff and/or Plaintiff's property to the black liquor released; (2) the duration, manner and amount of that exposure; (3) whether each Plaintiff's individual exposure to black liquor was the cause-in-fact of his or her injuries (*general* and *specific* causation);[5] and (4) whether each Plaintiff has actual recoverable damages. These issues relating to causation and damages must be decided on an individualized basis. Nonetheless, IP does not dispute that the causation and damages issues can be severed from the conduct issues allowing for a bifurcated trial plan where the class-wide issues can be tried on a class-wide basis and separately from the individual issues. If Phase One of the bifurcated trial plan focuses solely on class-wide conduct issues, the predominance and superiority requirements of Rule 23(b)(3) can be met as to each cause of action.

---

[4] Although IP disputes the validity of their claims, IP does not dispute that the types of claims asserted by the four bellwether claimants, Brent Jarrell and Elizabeth Simmons are largely representative of the types of claims being brought by the class as a whole. However, IP does note that, at this time, the *Bolton* matter is closed after being dismissed with prejudice due to Barry Bolton's failure to adequately represent his claimants. *See* No. 16-13346, R. Doc. 76. Moreover, Mr. Bolton is also a claimant in this matter and the sole class representative, upon information and belief, is his daughter. *See* Exhibit B, Barry Bolton Claim Form. Therefore, Mr. Bolton's representation of the *Bolton* claimants presents a conflict of interest. As such, should the court grant the Motion for Reconsideration and reinstate the *Bolton* claims, IP opposes his appointment to the Plaintiffs' Steering Committee and the class certification of the claims brought by the claimants represented by Mr. Bolton due to the lack of adequate representation. *See Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 606 (E.D. La. 2006) (adequacy or representation includes inquiries into the zeal and competence of the class representatives' counsel and the class representative(s)).

[5] In a chemical exposure case, Louisiana law requires a plaintiff to prove that the substance alleged to have caused his or her injury is, as a primary matter, capable of causing such harm. *Burst v. Shell Oil Co.*, No. 14-109, 2015 U.S. Dist. LEXIS 84072, at *5 (E.D. La. 2015) ("In a toxic tort suit, the plaintiff must present admissible expert testimony to establish general causation and specific causation."); *aff'd, Burst v. Shell Oil Co.*, 650 F. App'x 170 (5th Cir. 2016); *cert. denied, Burst v. Shell Oil Co.*, 137 S. Ct. 312 (2016).

Specifically, IP suggests that the following particular issues of Plaintiffs' claims, which are particular issues contemplated under Rule 24(c)(4) that speak to the issue of IP's conduct, predominate in this litigation:

As to Plaintiffs' negligence claims:

1. Whether IP owed a general duty to Plaintiffs (Plaintiffs proposed issue 3(i));
2. Whether IP's conduct failed to conform to the general standard of care (Plaintiffs proposed issue 3(ii)); and
3. Whether the scope of IP's duty includes preventing the types of harm alleged by Plaintiffs.[6]

As to Plaintiffs' strict liability claims:

4. Whether IP had *garde* of the evaporator when the rupture on June 10, 2015 occurred (Plaintiffs proposed issue 2(xiii));
5. Whether IP knew, or should have known, of the ruin, vice or defect in the evaporator dome sight glass that broke on the evening of June 10, 2015 ((Plaintiffs proposed issue 2(xvi));[7] and
6. Whether IP failed to exercise reasonable care in maintaining the evaporator dome sight glass that broke on the evening of June 10, 2015 (Plaintiffs proposed issue 2(xvii)).[8]

As to Plaintiffs' nuisance claims:

7. Whether the Release Event arose out of *work* at the Mill; and
8. Whether IP failed to exercise reasonable care in performing its work at the Mill.

In addition to the elements of their legal theories, the issues below relate to the class area or otherwise generally relate to Plaintiffs' claims as a whole and should be litigated only once. Accordingly, the following issues are additional particular issues subject to class-wide treatment:

---

[6] However, IP submits that this issue can only be certified to the extent it generally relates to preventing the offsite release of black liquor from the Mill. The issue of general causation must be determined on an individual basis. This is more fully explained in Section V of this Opposition.

[7] IP submits that certification of this legal issues is appropriate under Rule 23(c)(4). However, the factual disputes advanced by Plaintiffs as their proposed issue 2(xvi) is not a particular issue contemplated by Rule 23(c)(4).

[8] IP submits that certification of this legal issues is appropriate under Rule 23(c)(4). However, the factual disputes advanced by Plaintiffs as their proposed issue 2(xvii) is not a particular issue contemplated by Rule 23(c)(4).

9.  The times the release of black liquor on June 10, 2015 began and ended (Plaintiffs proposed issue 2(v));

10. The total amount of black liquor released through the broken evaporator dome sight glass and into the atmosphere and, separately, the area outside the Mill on June 10, 2015 (Plaintiffs proposed issue 2(ii));

11. The constituents of the black liquor released through the broken evaporator dome sight glass on June 10, 2015 and IP's knowledge related to the constituents of black liquor on that date (Plaintiffs proposed issue 2(i));[9]

12. The density of the black liquor released through the broken evaporator dome sight glass on June 10, 2015 (Plaintiffs proposed issue 2(vi));

13. The wind direction and other relevant weather conditions during the Release Event and for time periods otherwise relevant to the litigation (Plaintiffs proposed issue 2(vii));

14. Thea area where the black liquor released on June 10, 2015 was deposited (Plaintiffs proposed issue 2(xx)); and

15. The black liquor deposition levels within the area affected by the June 10, 2015 Release Event (Plaintiffs propose issues 2(xxi) and 2(xxii)).

However, as discussed below, IP opposes certification of certain "particular issues" advanced by Plaintiffs because they (1) are factual determinations to be made by the trier of fact to decide the legal issues certified by this Court; (2) relate to the causation (general and/or specific) and damages prongs of Plaintiffs' claims, which each Plaintiff must prove on an individual basis or (3) relate to an intentional tort claim Plaintiffs expressly disavowed.

---

[9] Although Plaintiffs complain in footnotes 2, 5 and 29 of their Motion for Class Certification that IP has refused to provide Plaintiffs with information relating to the known chemical composition of black liquor, IP offered Plaintiffs access to their property to sample the black liquor in the third effect of the evaporator tank. Plaintiffs accepted this offer and took multiple samples of that black liquor. Further, Plaintiffs unilaterally cancelled the 30(b)(6) deposition of IP rather than question a witness on this topic. Lastly, Plaintiffs have provided the testing analysis for black liquor taken from the recovery area and continue to work with Plaintiffs on the exact documents it seeks in its overly broad, vague and ambiguous discovery requests. If there is precise information Plaintiffs seek, there are procedural mechanisms that, if followed, would allow it to discover such information.

## V.    PLAINTIFFS' PROPOSED PARTICULAR ISSUES ARE INAPPROPRIATE FOR CLASS CERTIFICATION[10]

Rather than seek certification on the particular legal issues that are well-suited for class treatment, like those set forth above, Plaintiffs primarily propose certification of specific facts they would need to develop through discovery and prove at trial in order to prevail on the particular issues in this case. Certification of such hyperspecific factual issues is not what is contemplated or authorized by Rule 23(c)(4). As seen is the cases of *Murphy Oil* and *Mullen*, the particular issues contemplated for class certification under Rule 23(c)(4) are the legal issues (or elements) that make up a cause of action. Therefore, certifying the following questions of fact would go beyond the Court's discretion authorized by Rule 23(c)(4):

1. Did IP know, or should it have known, that its maintenance record-keeping or practices relating to the Evaporator and its appurtenances could result in a rupture or failure of the sight glass allowing the release of the chemical substances into the atmosphere on June 10, 2015 (Plaintiffs' proposed issue 2(xii));
2. Was IP warned of the potential safety hazards posed by the sight glasses on the dome of the Evaporator more than one year before the June 10, 2015 rupture? If so, did IP fail to perform maintenance that could have prevented the June 10, 2015 rupture (Plaintiffs proposed issue 2(xiv));
3. Were the actions of the employees of IP in failing to properly repair leaks on the Evaporator prior to June 10, 2015 a legal cause of the rupture and release of chemical substances into the atmosphere on June 10, 2015 (Plaintiffs proposed issue 2(xv));
4. Were unwarranted budget concerns a cause of the delay in completing repairs to the Evaporator which resulted in the rupture and release of chemical substances from the Evaporator at IP's Bogalusa Paper Mill on June 10, 2015 (Plaintiffs proposed issue 2(xviii));
5. At the time of the rupture, what knowledge IP have regarding the potential hazards presented by the chemical substances released into the atmosphere from its Bogalusa Paper Mill on June 10, 2019 [sic] (Plaintiffs' proposed fact 2(viii));[11]
6. When did IP acquire knowledge of the potential hazards presented by the chemical substances released into the atmosphere from the Evaporator at the Bogalusa Paper Mill on June 10, 2019 [sic] (Plaintiffs proposed fact 2(ix));[12]

---

[10] IP will not pursue the defense of contributory negligence. Therefore, Plaintiffs proposed issues 2(xxiii) and 2(xxiv) are not relevant to this litigation.

[11] The essence of what Plaintiffs propose with this issue is captured by particular issue 11 advanced by IP.

[12] *Id.*

7. What volatile organic compounds were released into the atmosphere on June 10, 2015 from the Evaporator at the IP Bogalusa Paper Mill (Plaintiffs proposed fact 2(iii));

8. What amount of volatile organic compounds were released into the atmosphere on June 10, 2015 from the Evaporator at the IP Bogalusa Paper Mill (Plaintiffs proposed fact 2(iv); and

9. Was Defendant IP's breach capable of causing Plaintiffs [sic] alleged injuries (Plaintiffs proposed fact 3(iii).

These nine purported issues are disputed facts Plaintiffs must prove through evidence at trial. Plaintiffs are seeking to circumvent these hurdles by asking the Court to make them issues for IP to prove or disprove rather than meet their own evidentiary burdens. Further, many relate to the issues of causation and damages, which are specific to the individual claimants and therefore not appropriate for class-wide determination.

### A. Issues Related to Causation and Damages Are Not Particular Issues that Can be Certified.

There are approximately 2,300 claimants who have submitted claim forms for participation as a claimant in this matter. Of those, more than 2,200 have raised personal injury claims. As has been demonstrated through the testimony of the four bellwether Plaintiffs, the duration and manner of the exposures alleged by each Plaintiff varies greatly and is dependent on facts such as each claimant's location and their conduct during the Release Event.

For example, Plaintiff Herbert Angel contends he was mowing his grass at his home on City Limits Road, which is approximately 1.8 miles north of the mill. Exhibit C, Deposition of Herbert Angel, at pp. 27:15-28:8. In contrast, Willie Bickham contends he was walking his dog near his home, which is south-east of the Mill. Exhibit D, Deposition of Willie Bickham, at pp. 18:23-25. Dominque Mingo, on the other hand, believes she was exposed to black liquor while in her car. Exhibit E, Deposition of Dominque Mingo, at pp. 18:18-20:17. Lastly, Linda Nunnery testified she was at her deceased mother's home, which is south-east of the mill, and then drove to her home, which is northeast of the Mill. Exhibit F, Deposition of Linda Nunnery, at pp. 14:20-

15:25. Ms. Nunnery could not definitively state at what point her person was exposed to the black liquor. Exhibit F, at pp. 65:7-66:19. These differences are representative of the class as a whole.

Furthermore, the types of personal injuries and/or property damages that have been discussed by the current bellwether claimants already demonstrate the amount of individual proof that will be needed on both general and specific causation. Mr. Angel is making personal injury claims for blurred vision, nausea, a clogged trachea, and emotional distress. Exhibit C, at pp. 34:6-38:13 and 63:25-65:7. Mr. Bickham is making personal injury claims for burning eyes and chest pain. Exhibit D, at pp. 28:2-34:10 and 53:19-64:4. Mr. Bickham is also making property damage claims for his vehicle, cabin, magnolia tree, pecan trees, and lawn. Exhibit D, at pp. 65:3-79:11. Ms. Mingo is making personal injury claims for her face breaking out, nausea, asthma flare up and flu-like symptoms. Exhibit E, at pp. 25:8-11; 36:18-24 and p. 52:8-16. Ms. Nunnery is making personal injury claims for headaches, irritated eyes and burning nose. Exhibit F, at pp. 23:7-13 and 36:17-37:24. Ms. Nunnery is also making property damage claims for her house, grass, fruit trees, pecan trees, bean plants, tomato plants, and car. Exhibit F, at pp. 38:3-48:4. Again, the varying and individualized nature of the bellwether Plaintiffs' claims is representative of the class and prevents class-wide treatment of causation and damages.

Moreover, due to the varying locations of the Plaintiffs at the time of the release, manner of exposure and types of damages alleged, each would have been exposed to a different amounts and concentrations of black liquor, if they were even exposed at all. Each Plaintiff must make a *prima facie* showing that even the worst-case volume of black liquor to which he/she was exposed, which is claimant specific, could cause the injuries he/she alleges, including adverse health effects.

Therefore, although a class-wide factual determination can be made regarding the volume of black liquor released during and the area generally impacted by the Release Event, each

Plaintiff will be required to individually establish the details of the exposure(s) relevant to his or her individual claims to prove the causation and damages prongs of their claims. Such evidence will largely be predicated on the location of each individual claimant at the time of the Release Event.

Causation includes both general and specific causation. *See Burst v. Shell Oil Co.*, No. 14-109, 2015 U.S. Dist. LEXIS 84072, at *5 (E.D. La. 2015) ("In a toxic tort suit, the plaintiff must present admissible expert testimony to establish general causation and specific causation."); *aff'd, Burst v. Shell Oil Co.*, 650 F. App'x 170 (5th Cir. 2016); *cert. denied*, *Burst v. Shell Oil Co.*, 137 S. Ct. 312 (2016). General causation is expressly opposed by IP as to each claimant, but for differing claimant specific reasons. Indeed, there are such varying claims, including claims of cancer,[13] that general causation must be tried individually. Further, general causation will be determined by the manner and location of exposure. The maximum exposures at issue here are incredibly low. Indeed, 2,300 claimants, few of whom were together during the Release Event, claim exposure to what is no more than 2,400 gallons of black liquor dispersed over an area Plaintiffs contend is 19 square miles. Although IP contends much less area than this was impacted, the deposition of the black liquor throughout the impacted area will vary depending on the proximality of the Mill. Accordingly, a determination regarding the volume of the black liquor to which each claimant (or the very small groups of claimants who were in the same area) was exposed will be required. This determination is necessary for the general causation analysis for each type of injury advanced by those claimants. Indeed, assuming, *arguendo*, that the released black liquor could cause the types of injuries alleged by a Plaintiff who was located outdoors and less than .5 mile from the Mill during the Release Event, this does not mean that the same is true for someone located indoors or for someone located more than 1.5 miles away (assuming the black liquor released even traveled that far). Plaintiffs cannot,

---

[13] *See* Exhibit G, Claim Form of Charles Johnson. Mr. Johnson was among the bellwether claimants identified by IP but stricken by Plaintiffs from the first bellwether group.

however, use the certification process to skip their burden on general causation. Therefore, certification of the issue of general causation, or the underlying facts necessary to prove the same, would not be proper. *See Paternostro,* 309 F.R.D. at 403.[14] Accordingly, Plaintiffs' proposed classification of any fact relating to causation and damages, such as issues 7 through 9 above, is improper. *See Steering Comm. v. Exxon Mobil Corp.,* 461 F.3d 598, 602 (5th Cir. 2006) (denying certification where individual issues of damages and causation predominate over any issues common to the class).[15]

In addition to being disputed facts, the following particular issues listed by Plaintiffs relate to intentional tort claims that they expressly represented to the Court they were not bringing in this matter:

1. Did IP intentionally omit or conceal material facts from its communications and disclosures to Class Members regarding the chemical composition of the chemical substances released into the atmosphere from the Evaporator at its Bogalusa Paper Mill on June 10, 2015 (Plaintiffs proposed issue 2(x));
2. Did IP intentionally disseminate false information to Class Members and community officials about the chemical substances released and the hazards presented by physical contact with the chemical substances released into the atmosphere from its Evaporator at the Bogalusa Paper Mill on June 10, 2015 (Plaintiffs proposed issue 2(xi)); and
3. Did IP intentionally fail to warn Class Members, government officials and/or the general public of the potential hazards presented by the chemical substances released into the atmosphere on June 10, 2015 (Plaintiffs proposed issue 2(xix)).

None of these factual disputes relate to the negligence, strict liability, or nuisance claims

---

[14] Of course, specific causation will require a specific dose calculation for each plaintiff, which will depend on such factors such as duration and manner of exposure, which varies greatly among the claimants. *See Paternostro,* 309 F.R.D. at 405.

[15] IP acknowledges that, as articulated by the Fifth Circuit in *See Steering Comm. v. Exxon Mobil Corp.*, certification in a mass tort case such as this one where causation is disputed is rarely proper. However, IP submits that despite the general causation issues present in this case, there are sufficient common issues relating to this specific Release Event that predominate over the individual issues allowing one to reach the conclusion that class certification of particular issues and a bifurcated trial plan, with general causation to be decided for each Plaintiff during Phase Two of the trial plan, is a superior manner for handling this specific litigation.

being pursued by Plaintiffs. Instead, they relate to misrepresentation claims Plaintiffs expressly denied pursuing.[16] *See* No. 16-12563, R. Doc. 22.

## VI.     IP'S PROPOSED TRIAL PLAN

Consistent with the foregoing, not all of the particular issues set forth in Plaintiffs' proposed trial plan are appropriate for class-wide treatment. IP states that the below trial plan would, on the other hand, allow for certification.

### A.  *Phase One*

IP agrees that the legal and factual findings in the Phase One litigation must be binding on all claimants. Such issues should strictly be limited to those identified by IP in Section IV above, *i.e.* those particular elements of Plaintiffs' negligence, strict liability and nuisance causes of action and general issues that relate to IP's conduct and potential liability such as setting the class area. Specifically, for the reasons set forth in Section V above, any issue relating to causation (general or specific) and damages must be addressed on an individual basis in the Phase Two trials. Indeed, to the extent the Court finds that IP's potential liability cannot be tried without a general causation determination, IP respectfully suggests class certification is improper because the individualized issues would then predominate over the class-wide issues. Either way, following Phase One, the individual claimants not dismissed following litigation of the issues in Phase One shall be allowed to proceed in Phase Two on the causes of action, if any, that survive the Phase One.

### B.  *Phase Two*

Phase Two would necessarily require a series of successive trials. However, such trials would include the issues of general causation in addition to specific causation and damages.

---

[16] To the extent Plaintiffs suggest these relate to their declaratory judgment action, as discussed in footnote 4 herein, Plaintiffs' declaratory judgment action, which they appear to have abandoned, is not suitable for class certification under Rule 23(b)(2).

Further, despite Plaintiffs' suggestion otherwise, November 12, 2019 could not be the date those trials commence. Indeed, November 12, 2019, the only trial date in this case, would be needed for the Phase One trial.

IP does not disagree that more than four claimants should comprise the trial flights for each of the Phase Two trials and submits that trying these cases in manageable groups of 10 similarly situated claimants is reasonable. However, the four current bellwether claimants are not similarly situated. Indeed, among other differences in their claims discussed in Section V-A above, each claimant's alleged exposure location was completely different than the other claimants. In fact, some were driving through the area, while others were not. As previously explained, these individual factual issues impact both general and specific causation. Further, at least two of the four bellwether claimants will likely not survive a Phase One determination regarding the area impacted by the Release Event. Accordingly, identifying the claimants suited for and setting any of the Phase Two trials is premature.

## VII.    CLASS DEFINITIONS AND PROPOSED BOUNDARY

Here, the class would include all persons who were located in the area impacted by the June 10, 2015 release of black liquor from the evaporator tank located on Defendant IP's paper mill in Bogalusa, Louisiana and who sustained injuries, loss, and/or damages as a result of that release. IP does not dispute that the impacted area can be set.[17] However, Plaintiffs' proposed class area is not consistent with the factual and scientific evidence in this matter.

Plaintiffs' proposed area is based on the opinions of Patrick Campbell, PhD set forth in his report, which was served on IP for the first time when Plaintiffs filed their Motions for Class Certification. Dr. Campbell's report does not contain opinions relating to weather conditions

---

[17] IP does not suggest that every person and/or his or her property found in the impacted area is entitled to recovery. As already argued herein, each claimant would need to prove causation and damages.

observed at the Mill or other reported environmental conditions at the time of the release event. Rather such opinions are contained solely in the report of another of plaintiffs' experts, Patrick Fitzpatrick, PhD. IP has requested dates for the depositions of Dr. Campbell and Dr. Fitzpatrick; however, those depositions will not take place before IP's deadline to oppose Plaintiffs' Motions. Accordingly, contemporaneously herewith, IP is filing a motion to continue Plaintiffs' submission date to allow IP to submit supplemental briefing in opposition to Plaintiffs' proposed class area. Nonetheless, some of the obvious deficiencies in Dr. Campbell's report and Plaintiffs' proposed class areas that are worth now noting.

Dr. Campbell opined regarding the "estimated particle transport and settling" of the black liquor released during the Release Event. Remarkably, Dr. Campbell provided 29 different model runs which lead to 29 different geographic areas for impact. (Dr. Campbell Report page 15, 16.) The runs represented 7 different ways of describing dispersion, 3 different particle settling velocities, and 2 different release locations. (Dr. Campbell's report page 14.) Dr. Campbell did not state which model run or methodology was correct, or most accurate., or represented his opinion. Instead, Plaintiffs self-servingly combined at least 28 of the 29 runs to create their proposed class area. This is clearly improper.

Second, Dr. Campbell ignored the only relevant wind speeds and directions, which are the actual wind speeds and directions which occurred, and were measured and recorded, at the IP plant at the time of the release. The wind speeds and directions at the plant at the time of the release were measured and recorded by IP's plant anemometer and PI System and were reported in Dr. Fitzpatrick's report. Dr. Campbell does not rely on this actual plant data, or even Dr. Fitzpatrick's report. Instead, Dr. Campbell substituted wind speeds and directions described in paragraph 2.2.3.a and represented in Figure 3 of his report (pages 10 and 12). Almost all of the wind speed and

directions used by Dr. Campbell are at least scores, and in many instances more than one hundred, kilometers removed from the plant. In short, Dr. Campbell's report reflects that he formed his opinions on data which has nothing to do with what actually happened at the plant during the release. Dr. Campbell also substituted irrelevant and incorrect data regarding wind direction and temperature for winds at particular atmospheric heights for those actually measured at the plant and/or reported by Dr. Fitzpatrick.

Third, because Dr. Campbell ignored the actual wind speed and direction data in favor of other irrelevant data, he reached the untenable conclusion that substantial areas to the south of the release point were affected by the Release Event. It is undisputed, and confirmed by the plant anemometer, by the PI system data, and by Dr. Fitzpatrick, that there was a near constant wind at the plant during the incident from the south to the north.[18] A wind from the south to the north would obviously carry the release materials to the north of the release point. To the contrary, Dr. Campbell opined that substantial areas to the south of the release point were affected by the Release Event.

Fourth, Dr. Campbell stated that there was a release of 2,400 gallons of black liquor during the 40-minute period from 6:40 to 7:20 PM on June 20, 2015. (Dr. Campbell Report, at 2.1.2.a, page 3.) Then Dr. Campbell asserted that the flow rate of the release was 3,503 gallons per minute, which meant that the entire release would have occurred in less than 1 minute. (Dr. Campbell Report, at 2.1.3.c, page 5.) Then, Dr. Campbell's flip-flopped again, and prepared 29 model runs which lasted – not for 1 minute, or for 40 minutes – but for 6 hours.

Finally, Dr. Campbell's geographic areas are indefensible a result of his use of the HYSPLIT model, which is not the preferred model of the Environmental Protection Agency for

---

[18] *See also* Report of Patrick Fitzpatrick, at CA. No. 16-12563, at R. Doc. 182-10.

chemical releases from industrial sites. *See* 40 C.F.R. Part 51 App W, at § 4.2.2.1. To the contrary, AERMOD is preferred model and required by the EPA for a wide range of regulatory applications. *Id*. Indeed, by choosing HYSPLIT, Dr. Campbell became bound to use the *forecasted* wind data available in HYSPLIT, rather than the actual wind data, as discussed above.

Therefore, Dr. Campbell's models are not reliable and should not be used to set the class area.

## VIII.   <u>CONCLUSION</u>

For the reasons set forth herein, IP does not dispute that, given the facts that have been developed and the current posture of this case, the issues common to the class as a whole tend to predominate over the individual issues. Further, the benefits of the class action format for case management support class action treatment of particular issues underlying Plaintiffs' causes of action. However, the issues suitable for class treatment do not include causation (general or specific) or damages, which are issue that require extensive individualized proof that would preclude class treatment. Accordingly, IP does not oppose class certification with a bifurcated trial plan that severs the issues of general and specific causation and damages for a separate phase of litigation.

Respectfully submitted,

**FORMAN WATKINS & KRUTZ, LLP**

*/s/ Erin Wedge Latuso*
**TIM GRAY, #31748**
**DANNY MULHOLLAND, Pro Hac Vice**
**ERIN WEDGE LATUSO, #31560**
**CHELSEA E. GAUDIN, #37692**
201 St. Charles Avenue, Suite 2100
New Orleans, LA 70170
Telephone: (504) 799-4383
Facsimile: (504) 799-4384
Erin.Latuso@formanwatkins.com
Daniel.Mulholland@formanwatkins.com
Chelsea.Gaudin@formanwatkins.com
LAeService@formanwatkins.com

*Attorneys for International Paper Company*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing pleading has been served upon all known counsel of parties to this proceeding by mailing a copy of same via hand, facsimile, electronic mail, FedEx, First Class U.S. mail, properly addressed and postage prepaid on this 7th day of May, 2019.

*/s/ Erin Wedge Latuso*
**ERIN WEDGE LATUSO**