**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **SHIRLEY SLOCUM, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 16-12563** |
| **INTERNATIONAL PAPER COMPANY, ET AL.** | |
| **DERRICK SANDERS, ET AL.** | **NO. 16-12567** |
| **VERSUS** | |
| **INTERNATIONAL PAPER COMPANY, ET AL.** **BRENT JARRELL, ET AL.** | |
| | **NO. 16-13793** |
| **VERSUS** | |
| **INTERNATIONAL PAPER COMPANY, ET AL.** | **SECTION "L" (1)** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This litigation arises out of alleged injuries and/or property damage sustained by Plaintiffs as a result of a discharge of a substance known as "black liquor" from the top of an evaporator tank ("the Evaporator") at International Paper Co.'s ("IP's" or "Defendant's") paper mill in Bogalusa, Louisiana on June 10, 2015. Black liquor is a by-product of the paper making process. It is typically recycled in evaporator tanks for repeated use in the paper making process. On June 10, 2015, the sight glass of the Third Effect in the Evaporator system at the Bogalusa paper mill ("the Paper Mill") ruptured, resulting in the release of 773 gallons of black liquor several feet into the air and its dispersal into the area surrounding the plant.

As a result of this incident, a number of putative class actions were filed against IP in Washington Parish state court. The Defendant removed the cases to this Court pursuant to the Class Action Fairness Act. The cases were consolidated and discovery commenced. On April 30, 2019, Plaintiffs moved to certify the matter as a class action under Federal Rule of Civil

Procedure 23. After hearing from the parties, the Court issued an opinion on May 21, 2019 certifying the matter as an issue-based class action under Rule 23(c)(4), allowing class determination of the liability issue and non-class determination of the damage issues. R. Doc. 207. Further, after taking a trip to the site of the incident with counsel for both parties, the Court defined the potential geographical area of the class. R. Doc. 266. In addition, the Court concluded that the matter could be more efficiently and effectively tried in two phases: a liability phase and a damage phase. *Id.* at 3. The parties agreed that the liability phase could be tried in one bench trial and the damages phase in serial jury trials.

The bench trial on the issue of liability commenced on October 25, 2021 and concluded on October 26, 2021. The Court, after having carefully considered the testimony of all witnesses, the exhibits entered at trial, and the record, hereby enters this Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). To the extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such, and to the extent that a conclusion of law constitutes a finding of fact, the Court adopts it as such.

## I.  FINDINGS OF FACT

At the time of the incident giving rise to this lawsuit, Defendant IP owned and operated the Paper Mill located in Bogalusa, Louisiana. (Uncontested Fact #1). Since the 1940s, the Paper Mill has manufactured brown kraft and board paper known as "container board liner" of different thicknesses, which is used in making boxes. The facility is a closed loop system, from the cooking of trees to the making of pulp to the production of the finished paper. The paper is then put on large rolls and transported to the box factory.

A by-product of this process is a used or left-over cooking liquor known as "black liquor." IP recycles the black liquor by-product for repeated use in the papermaking process. In

order to recycle the black liquor, water that is introduced during the cooking process must be removed. (Corporate Deposition of Kadant Black Clawson, LLC). This residual water is separated from the black liquor through an evaporator system, an apparatus composed of a series of pressure vessels or tanks called "Effects." Steam is applied to the Effects, reducing the amount of water present as the black liquor travels through each successive Effect and thereby concentrating the black liquor. (Corporate Deposition of Kadant Black Clawson, LLC). After the evaporation process concludes, the solids that remain are burned in a recovery boiler for reuse in the process. The energy from the steam and condensate from the Evaporator is maintained and returned to the powerhouse for reuse. IP maintains eyewash stations and a shower on the premises of the Paper Mill to mitigate any harm to workers resulting from exposure to black liquor. (Testimony of David Villarrubia).

The Paper Mill's evaporator system has eight Effects and each has a dome. The Effect involved in the incident at issue in this case was the Third Effect. (Uncontested Fact #15). An Effect's dome has two 6-inch diameter holes with glass covers or sight glasses designed for observing the evaporation process while the Evaporator is operating. Despite the sight glass's intended purpose of enabling viewing of the inside of the Effects, IP employees cannot actually see through the sight glass and into the Effects because the sight glasses become pitted and cloudy. (Testimony of David Villarrubia).

The sight glasses on each Effect are about 4- to 6-inches apart and are located near the top of the dome. The sight glasses are made from Pyrex, which is a borosilicate glass able to withstand considerable heat without fracturing. This type of glass, however, will corrode when exposed to alkaline environments and chemicals such as sodium hydroxide, which is present in the Effects of the Evaporator during the paper-making process. This environment attacks the

molecular structure of the glass, weakening the glass's strength.  For this reason, as well as because the covers become pitted and cloudy and hard to see through, sight glasses need to be periodically changed. (Testimony of Dr. Thomas Shelton and his expert report, p. 8). If a sight glass on the Evaporator breaks, the black liquor in the Evaporator will shoot out into the air. (Testimony of David Villarrubia). Where the black liquor that is released ends up ultimately depends on the "luck of the wind." (Testimony of David Villarrubia).

Historically, the sight glasses on the Effects of the Evaporator were changed periodically based, in part, on whether they were leaking. (Testimony of David Villarrubia). Prior to the incident at issue in this case, IP had not changed the sight glasses on the Third Effect since 2012. (Uncontested Fact #25). IP's inaction in replacing the sight glasses on the Third Effect was contrary to advice from trusted and experienced industry professionals from inside and outside of the company. (Testimony of David Villarrubia and Corporate Deposition of Kadant Black Clawson, LLC).

First, in 2012, David Villarrubia, a senior employee at the Paper Mill who had been employed at the plant since 1982, recommended that IP replace all sight glasses on the Evaporator. (Testimony of David Villarrubia). Villarrubia expressly advised that IP substitute the sight glasses with "steel blanks" during the Paper Mill's 2013 annual outage, a planned shutdown of the plant during which IP performed maintenance and repairs. IP planned on implementing Villarrubia's advice with respect to all sight glasses on the Effects. (Testimony of David Villarrubia). Indeed, Villarrubia, who at the time of the incident was an "area manager" in charge of the evaporators and recovery boilers, believed that IP had followed through on this plan. (Testimony of David Villarrubia). But in fact, IP relaced the sight glasses on only some of

the Effects with steel blanks. The sight glasses on the Third Effect were not replaced with steel blanks or, for that matter, with new sight glass. (Testimony of David Villarrubia).

Second, in 2014, Kadant Black Clawson, LLC (KBC), a company IP engaged to conduct a third-party inspection of the Paper Mill, advised IP to replace the sight glasses on the Evaporator. (Corporate Deposition of Kadant Black Clawson, LLC). KBC's March 2014 review of the Paper Mill was conducted by Ivan Rogers, a design engineer who had been employed at KBC since 1998 and had inspected the Paper Mill since at least 2011. (Corporate Deposition of Kadant Black Clawson, LLC). Following Rogers's inspection, he issued a report in June 2014 recommending that IP change the glass covers on the dome of the Third Effect during the 2015 annual outage. (Uncontested Fact #30). IP had both glass covers and stainless steel covers available in the Paper Mill's inventory during the 2015 annual outage. (Uncontested Fact # 42). Additionally, IP's on-duty mechanics can replace a sight glass cover with a steel blank within twenty minutes. (Uncontested Fact #41 and Testimony of Michael T. Lang). Despite these facts, IP did not replace all sight glass covers during the annual outage in April 2015.

During the 2015 annual shutdown, Rogers again inspected the Paper Mill and, in July 2015, issued a report that again recommended that these covers be changed. (Uncontested Facts #33 & 34). On June 4, 2015, the bottom sight glass cover on the dome of Third Effect of the Evaporator began leaking. IP employees tightened its bolts, and the leaking stopped. (Uncontested Fact #36). On June 5, 2015, another leak was detected on the bottom sight glass on the dome of the Third Effect. IP personnel again stopped the leak by tightening the sight glass's bolts. (Testimony of David Villarrubia and Plaintiffs' Exhibit #14).

Also on the evening of June 5, 2015, IP shut down the Evaporator due to the failure of a main line electrical breaker. The electrical outage was repaired, and the Evaporator was brought

5

back online on or around the early morning of June 7, 2015, over a day after the outage started. The sight glass covers on the dome of the Third Effect were not replaced during the June 2015 electrical outage. Again, IP had material in stock to replace the sight glass covers on the dome of the Third Effect during the June 2015 electrical outage. (Uncontested Fact # 40).

On June 8, 2015, the upper sight glass on the dome of the Third Effect began to leak. (Uncontested Fact # 43). IP employees tightened its bolts on June 9, 2015, and the leak stopped. (Testimony of David Villarrubia). That same day, Villarrubia sent an email to other IP employees notifying them of the leaks from the bottom and top sight glasses on the Third Effect. (Plaintiffs' Exhibit #14). The email also stated that a work notice, which is used by IP to start the process for maintenance work, was entered into the "system." (Plaintiffs' Exhibit #14).

Then, on June 10, 2015, a sight glass cover on the Third Effect failed, resulting in the release of a combination of steam and black liquor from the Third Effect. (Uncontested Fact #15). The release began at 6:40 p.m. and ended at 7:18 p.m. (Uncontested Fact #16). Approximately 773 gallons of black liquor was released into the air from the Third Effect and traveled beyond the Paper Mill's fence line and into the surrounding community. (Uncontested Facts #17-19). The potentially affected area was most recently defined in the Court's opinion of March 9, 2020. R. Doc. 266. After the release event, IP's employees removed both sight glasses on the Third Effect and replaced them with steel blanks obtained from the Paper Mill's inventory. (Testimony of Michael T. Lang).

Within an hour of the incident, emergency responders cordoned off roadways in the vicinity of the Paper Mill from pedestrian and vehicular traffic. (Testimony of Harold Bruce Reid). An internal IP email dated June 10, 2015 at 8:10 p.m. from David Carter, the Paper Mill's Safety Manager, to Kalisa Hyman, Communications Manager for the Paper Mill, states that IP

shared its Safety Data Sheet on black liquor with emergency responders from the Bogalusa Fire Department who attended to the rupture. (Deposition of Kalisa Hyman and attached exhibits). At trial, however, Bogalusa Fire Department Captain Harold Bruce Reid stated that he requested a Safety Data Sheet on black liquor from an IP employee within hours of the discharge but never received one. (Testimony of Harold Bruce Reid).

On the morning of June 11, 2015, the day after the incident, Hyman sent an email to IP's Community Advisory Committee, a group of twelve community members that served as IP's liaison with the Bogalusa community; among the group's members were bankers, local business owners, and the then-superintendent of the Bogalusa school district. (Testimony of Willie Breaux and Deposition of Kalisa Hyman). Hyman's email informed the group that there had been "a slight leak" at the Paper Mill the previous night, "creat[ing] a mist of diluted black liquor, the majority of which remained on mill property." (Plaintiffs' Exhibit 53). The email further stated: "We are confident that there is <u>no risk</u> to human health or the environment." (Plaintiffs' Exhibit 53). Hyman also encouraged members of the group to share with others in the community that black liquor does not pose a risk to human health or to the environment. (Deposition of Kalisa Hyman).

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109–2, 119 Stat. 4 (2005) (codified in scattered sections of Title 28, U.S.C.). R. Doc. 29. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiffs' claims occurred in Bogalusa, Louisiana, which is within the jurisdiction of the Eastern District of Louisiana.

**B. Applying Louisiana Law**

Plaintiffs' claims arise under state law, so this Court must conduct an '*Erie* analysis' to determine how it believes the Louisiana Supreme Court would resolve the questions of substantive law presented. Federal courts interpreting Louisiana law must also employ the principles of construction followed by Louisiana state courts. *Gen. Elec. Cap. Corp. v. Se. Health Care, Inc.,* 950 F.2d 944, 950 (5th Cir. 1991). In Louisiana, "[t]he sources of law are legislation and custom." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.,* 395 F.3d 533, 546 (5th Cir. 2004) (quoting La. Civ. Code art. 1). In addition to these authoritative or primary sources of law, the Court's decision may be guided by persuasive or secondary sources of law, including the jurisprudence of Louisiana courts and equity. *Id.* (citing La. Civ. Code art. 1 rev. cmt. b).

Plaintiffs have filed claims under Articles 2315, 2317 and 2317.1, and 667. The Court considers each claim in turn.

**C.  Louisiana Civil Code Article 2315**

Plaintiffs press claims under Article 2315 of the Louisiana Civil Code, which provides: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315.[1]  This statute serves as the primary basis for negligence liability in Louisiana. *See Barasich v. Columbia Gulf Transmission Co.,* 467 F. Supp. 2d 676, 690 (E.D. La. 2006). Louisiana courts conduct a duty-risk analysis to determine whether liability attaches under Article 2315. *Lemann v. Essen Lane Daiquiris, Inc.,* 923 So.2d 627, 632–33 (La. 2006). Under this analysis, a plaintiff must prove each of five elements: (1) the defendant had a duty to conform his conduct to a specific standard of care (the duty element); (2) the

---

[1] In pretrial briefing, IP stated that, although Plaintiffs cannot prove negligence, it was willing to stipulate to negligence under Article 2315 in return for a class-wide order dismissing Plaintiffs' other theories of recovery. R. Doc. 425 at 2. It goes without saying that IP's strategic offer plays no role in the Court's legal analysis or conclusions with respect to any claim.

defendant's conduct failed to conform to the appropriate standard of care (the breach element) (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability element); and (5) actual damages (the damages element). *Long v. State ex rel. Dep't. of Transp. & Dev.*, 2004-0485 (La. 6/29/05), 916 So. 2d 87, 101. As explained in the class certification Order, R. Doc. 207, elements one, two, and four are class-wide issues and therefore are to be resolved at this stage of the proceedings. Because elements three and five of the duty-risk analysis require individualized inquires, they can be addressed only at the second phase of this litigation when the particular claims of each Plaintiff are adjudicated.

### 1.     Duty Element

Under Louisiana law, a legal "[d]uty is usually defined as 'the obligation to conform to the standard of conduct of a reasonable man under like circumstances.'" *Ellison v. Conoco, Inc.,* 950 F.2d 1196, 1205 (5th Cir. 1992) (quoting *Seals v. Morris,* 410 So.2d 715, 718 (La. 1981)). The Court need not discuss extensively the duty element. It suffices to state that, as IP acknowledges, the law imposes a duty on Defendant to exercise reasonable care in relation to its operation of the Paper Mill. R. Doc. 425 at 10.

### 2.     Breach Element

Plaintiffs contend that IP's conduct was unreasonable, and therefore IP breached its duty of care, because IP "could have prevented the [rupture] but failed to do so." R. Doc. 430 at 9. IP disagrees, arguing that, despite the rupture, its maintenance of the sight glass that failed was reasonable under the circumstances. R. Doc. 487 at 4-13. As detailed below, the Court finds that IP breached its duty of care.

The Court heard abundant testimony and received into evidence numerous exhibits pertaining to IP's maintenance of the sight glasses on the Evaporator. To begin, the Court heard testimony from David Villarrubia, who had primary responsibility for the Evaporator at the time of the incident and had decades of experience at the plant. Villarrubia testified that, in 2012, he requested that IP replace all of the sight glasses on the domes of the Evaporator with steel blanks during the 2013 annual outage and that IP had planned on making this change. As noted, at the time of the 2015 rupture, Villarrubia erroneously believed that IP had executed its plan to replace all sight glasses with steel blanks. In actuality, IP had only replaced some of the sight glasses with steel blanks and had not replaced those on the Third Effect. (Testimony of David Villarrubia). Had IP followed Villarrubia's recommendation to swap all sight glasses for steel blanks in 2013, the June 2015 rupture likely could have been prevented.

The Court also reviewed evidence relating to the work of the Paper Mill's third-party inspector, Ivan Rogers. Rogers, a technical expert on evaporators employed by KBC, visited the Paper Mill for several days in March 2014 during the plant's annual outage. Based on his observations, Rogers produced a report in June 2014 that made recommendations for repairs and maintenance for IP to perform. (Plaintiffs' Exhibit #34). In particular, Rogers advised IP to replace the sight glass on the Third Effect of the Evaporator during the plant's planned outage in the spring of 2015. He explained that this action was recommended because of a "safety issue" and because new glasses may assist IP with viewing the processes inside the Evaporator. (Plaintiffs' Exhibit #34). IP, however, failed to follow Rogers's advice to change all sight glasses or replace them with steel blanks during the Paper Mill's annual outage in April 2015. Just as IP could have averted the rupture by following the recommendation of Villarrubia to exchange the

sight glasses for steel blanks in 2013, IP passed up another chance to avoid the incident when it elected not to implement the advice Rogers provided in 2014.

During the Paper Mill's annual outage in 2015, between April 23-28, 2015, Rogers again inspected the facility. (Plaintiffs' Exhibit #35). Rogers did not issue his post-inspection report until July 10, 2015, however—one month after the sight glass rupture. In his 2015 report, which is based on his pre-rupture inspection and does not make reference to the rupture, Rogers again recommended that IP change or replace the glasses on the top of the domes of the Evaporator; as with his 2014 report, the 2015 report cited safety concerns and visibility as the reasons for changing or replacing the sight glasses. *Id.* The 2015 report called for IP to make this fix "during the 2016 outage . . ., if not finished during the 2015 outage." (Plaintiffs' Exhibit #35)*.* But by the time Rogers issued his 2015 report, it was too late to avert the incident.

Replacing the sight glass on the Third Effect with new sight glass or with steel blanks would have imposed only a minimal burden on IP. Throughout 2015, IP had sight glass and steel blanks in stock at the Paper Mill. Also, an IP employee, Michael Lang, testified that the entire process to remove the sight glass and install a steel blank in its place could be completed within 15-20 minutes when two mechanics work together. (Testimony of Michael Todd Lang). Indeed, Lang replaced both the bottom and top sight glasses on the Third Effect with steel blanks taken from IP's supply just hours after the incident. IP thus could have replaced the sight glasses on the Third Effect either during the Paper Mill's annual outages in 2014 or 2015, or at some point during the electrical outage on June 5-7, 2015, without imposing significant costs or causing major disruptions to the Paper Mill's operations.

Two experts also provided testimony demonstrating that IP breached its duty to act with reasonable care with respect to its operation of the Paper Mill. First was the testimony of

Michael Klein, an expert in the field of systems engineering and maintenance. Klein testified that IP breached "sound engineering maintenance practice" when it failed to perform a safety hazard analysis following receipt of Rogers's recommendation in 2014 to change or replace the sight glasses. (Testimony of Michael Klein).

Second, Dr. Thomas Shelton, an expert in material science and failure analysis, discussed physical evidence indicating that the sight glass on the Third Effect should have been replaced. (Testimony of Dr. Thomas Shelton). For example, Dr. Shelton testified about the mica shield, a component placed between the gasket and the sight glass that is designed to protect the sight glass from corrosion caused by exposure to chemicals. In preparation for his testimony, Dr. Shelton reviewed one of the mica shields taken from the Third Effect. He testified that the top of the mica shield was covered in thick layers of black, tarry deposits, suggesting that black liquor had collected in the space between the mica shield and the sight glass. Dr. Shelton explained that black liquor deposits can "attack the glass" and that a sight glass from the Third Effect exhibited etching or corrosion, indicating a substantial amount of deterioration in the sight glass's structural properties. This corrosion, according to Dr. Shelton, contributed to the failure of the sight glass on the Third Effect. Moreover, Dr. Shelton stated that IP had substantial notice that it should have replaced the sight glasses on the Third Effect and had multiple opportunities to do so between 2013—when IP first received notice that the sight glasses should be changed out—and June 10, 2015 when the rupture occurred.

IP presented no expert witness testimony whatsoever. Thus, the testimony of Plaintiffs' experts was unrebutted.

IP contends that it did not act unreasonably for two main reasons. First, IP argues that it did not ignore safety issues or unreasonably delay replacing the sight glasses. R. Doc. 487 at 8-

11. Second and relatedly, IP argues that it was the upper sight glass on the Third Effect of the Evaporator that failed, not the lower sight glass. And IP avers that it maintained the upper sight glass in a responsible manner. *Id.* at 4-10.

Neither of IP's arguments is persuasive. First, Villarrubia called for IP to change out the sight glasses to steel blanks in 2013, years before the rupture. And Rogers recommended to IP in his 2014 report that the company replace the sight glasses on the Evaporator, expressly citing safety as a concern. But IP downplays any concern about safety. IP points out that, in his deposition, Rogers explained that his safety concern about the sight glasses was not that they would rupture and release black liquor into the atmosphere; instead, Rogers said he was specifically concerned that the sight glass would break and injure a worker who was looking into the glass. (Corporate Deposition of Kadant Black Clawson, LLC). Even though Rogers articulated a safety concern vis-à-vis the sight glasses during his deposition that differs from the risks of rupture that Plaintiffs complain of, the fact remains that Rogers notified IP of a safety issue in 2014 pertaining to its maintenance of the sight glasses and advised IP to remedy the issue well before the incident at issue occurred. Indeed, Rogers's concern that the sight glasses would break if they were not changed or replaced ultimately proved prescient. Furthermore, it is foreseeable that the rupture of an Effect's sight glass could cause the black liquor, which is under high levels of pressure, to shoot out of the pressure vessel and into the air and potentially, depending on the wind speed and direction, cause damage to the surrounding community. (Testimony of David Villarrubia and Michael Klein).

IP's second argument is similarly unavailing. IP contends that the evidence shows that the upper sight glass on the Third Effect failed and that it adequately maintained this sight glass.

IP's argument is an attempt to counter testimony by Plaintiffs' experts concerning its handling of the sight glasses.

Plaintiffs' experts noted that the Third Effect leaked multiple times in June 2015 and that IP, in an effort to stop the leaks, repeatedly tightened the sight glasses. The experts opined that, by repeatedly tightening the sight glasses, IP likely applied an unreasonable amount of force that caused one of the sight glasses to rupture. Michael Klein, the expert in systems engineering and maintenance, testified that engineers "only get one bite at the apple." (Testimony of Michael Klein). In other words, as Klein elaborated, if IP's hypothesis was that the sight glasses on the Third Effect were leaking because their bolts were loose and that tightening them would solve the issue, then IP should have abandoned that theory once the sight glasses leaked again after being tightened. (Testimony of Michael Klein). But instead of rejecting its erroneous supposition about the cause of the leakage, as a prudent company would, Klein testified that IP doubled down on its disproven theory by continuing to tighten the bolts, exposing the sight glass to conditions beyond its "tensile strength." (Testimony of Michael Klein).

IP counters that the upper sight glass—the one that it contends failed—was only tightened once after leaking and thus was not subjected to repeated stress that could have caused it to break. Applying Klein's own "one bite at the apple" theory, IP asserts it did not proceed in an unreasonable manner by tightening the bolts on the sight glasses.

At trial, evidence was adduced that the lower sight glass on the Third Effect leaked twice the month of the incident and that IP employees tightened it each time; the upper sight glass on the Third Effect leaked, and was thus tightened, only once. Specifically, Villarrubia testified that the lower sight glass on the Third Effect leaked on June 4 and 5, 2015. After each leakage, IP employees tightened the lower sight glass's flanges to stop the leak. Villarrubia further testified

that the upper sight glass on the Third Effect leaked for the first and only time on June 9, 2015. IP employees responded by tightening its bolts to halt the leak.

In addition to testimony about which sight glass leaked and when, Villarrubia testified that only the upper sight glass on the Third Effect failed. In his expert report, Dr. Shelton reached the same conclusion. Thus, as noted, IP asserts that the upper sight glass on the Third Effect failed and that it was only tightened once after it leaked. Based on these two assertions, IP argues that Plaintiffs are incorrect that the sight glass's failure was caused by repeated stress from tightening. IP thus claims it has refuted the argument of Plaintiffs' experts that a contributing factor to the sight glass's failure was IP's application of too much pressure when tightening the piece.

There are several problems with IP's argument. For starters, even if the upper, rather than lower, sight glass on the Third Effect failed, the sight glasses are only several inches apart on the dome of the Third Effect. It is entirely conceivable that the undue tightening of the lower sight glass would place too much pressure on the upper sight glass and thus contribute to its failure. Further, that the lower sight glass continued to leak, despite IP having already tightened its bolts, should have indicated to IP that simply tightening the bolts on the upper sight glass would not resolve the problem. More importantly, IP had notice well before the sight glasses leaked— indeed, years before the June 2015 leaks—that it should have replaced the sight glasses for safety reasons. Yet, it chose not to replace them with newer sight glass or with steel blanks, even when it had other sight glasses as well as steel blanks available and could install the steel blanks in twenty minutes or less. That IP entered a work notice to begin the process of fixing the sight glasses on the Third Effect only days before the rupture event was too little, too late.

In sum, the Court finds that IP breached its duty to operate and maintain the Paper Mill in a reasonably safe manner. The Court turns to the next element of the duty-risk analysis pertinent to this phase of the proceedings.

### 3.  Duty/Risk or Scope of Liability Element

The duty-risk analysis asks whether the risk of harm and the harm that was allegedly caused are "within the scope of protection afforded by the duty breached." *Maw Enters., L.L.C. v. City of Marksville*, 149 So. 3d 210, 220 n.9; 2014-0090 (La. 9/3/14). Defendant's duty to operate its Paper Mill, including the Evaporator, in a reasonably safe manner certainly encompasses preventing ruptures of its machinery that can harm the surrounding public. Stated differently, the duty of reasonable care imposed on IP includes protecting against the particular harms that Plaintiffs claim to have suffered. *See Manuel v. City Manuel v. City of Jeanerette*, 95-1202 (La. App. 3 Cir. 9/10/97), 702 So. 2d 709, 713. Accordingly, Plaintiffs have carried their burden on the scope-of-liability element.

### 4.  Conclusion on Louisiana Civil Code Article 2315 Claims

The Court concludes that Plaintiffs have established the following three elements of their negligence claim under Article 2315: (1) IP had a duty to conform its conduct to a specific standard of care; (2) IP's conduct failed to conform to the appropriate standard of; and (3) IP's substandard conduct was a legal cause of Plaintiffs' injuries. *See Long*, 916 So. 2d at 101.

### D. Louisiana Civil Code Articles 2317 and 2317.1.

Plaintiffs also assert claims under Articles 2317 and 2317.1. Article 2317 provides:

> We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.

La. Civ. Code. art. 2317. Article 2317 is modified by Civil Code Article 2317.1, which reads:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

*Id.* art. 2317.1 (Act No. 1, 1 La. Sess. Law. No. 1 (1996)). Read together, Articles 2317 and 2317.1 impose a negligence standard. *Carroll v. Am. Empire Surplus Lines Ins. Co.*, 289 F. Supp. 3d 767, 771 (E.D. La. 2017). In particular, for a plaintiff to prevail under these codal provisions, she must prove: "(1) Defendant had custody of the area in question; (2) that the area contained a defect that created an unreasonable risk of harm; (3) that the defect was the cause of the harm; and (4) the custodian of the area knew or should have known of the defect." *Jones v. Town of Gueydan*, 2021-11 (La. App. 3 Cir. 6/16/21), 323 So. 3d 451, 453, *writ denied*, 2021-01038 (La. 11/23/21).

Considering the first element, it is undisputed here that IP had custody of the Paper Mill, including the defective sight glass, and that the failure of IP's sight glass caused black liquor produced by the plant to escape from the pressure vessel, discharge into the air, and travel beyond the plant's premises. Regarding the second element, it is clear that the rupture of the sight glass constitutes a defect on the premises. But, as IP points out, "[n]ot every defect gives rise to liability." R. Doc. 425 at 14 (quoting *Babino v. Jefferson Transit*, 12-468 (La. App. 5 Cir. 2/21/13), 110 So. 3d 1123, 1126). In order for liability to attach, "[t]he defect must be of such a nature to constitute a dangerous condition, which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances." *Babino*, 110 So. 3d at 1126.

For reasons similar to those that Plaintiffs' carried their burden on the scope of liability element under Article 2315, Plaintiffs have demonstrated that the defect at the Paper Mill created an unreasonable risk of harm to Plaintiffs. Villarrubia testified that if black liquor is under pressure it will "shoot into the air." (Testimony of David Villarrubia). Thus, it was foreseeable that a rupture of the sight glass on the Evaporator, a type of pressure vessel, could cause the black liquor contained therein to be released and to potentially travel beyond the premises. It was also predictable that the black liquor could, in one way or another, cause harm to those in the area surrounding the Paper Mill. Moreover, the risk of harm due to IP's maintenance of its sight glasses on the Third Effect was unreasonable because IP likely could have prevented the rupture by simply replacing those sight glasses with the other sight glasses or steel blanks it had in stock. And the replacement of the sight glasses could have been effectuated in a matter of minutes. By opting not to change out the sight glasses on the Third Effect, IP tolerated a safety risk, as IP's outside consultant, Rogers, warned the company in a report issued over a year before the release event. Weighing the likelihood and substantiality of the risk of harm against the minimal burden that preventing that risk imposed on IP, the Court finds IP's conduct to be unreasonable under the circumstances.

These same facts show that IP knew or had constructive knowledge of the vice or defect at the Paper Mill. That finding is also supported by testimony from Villarrubia, who testified that IP was supposed to replace the sight glasses on the Third Effect during the 2014 annual outage, and by Plaintiffs' experts, who stated that IP should have replaced the sight glasses on the Third Effect for safety reasons. And, of course, IP attempted to cure the leaking of both the upper and lower sight glasses on the Third

Effect only days before the incident. Thus, IP knew that the sight glasses on the Third

Effect were experiencing performance failures in the days leading up to the rupture.

Accordingly, IP should have known that the sight glasses could be defective and thereby

pose a safety risk.

The third element of Plaintiffs' claims under Articles 2317 and 2317.1—that the

defect at the Paper Mill was the cause-in-fact of Plaintiffs' injuries—requires

consideration of each individual Plaintiffs' case and therefore must await adjudication at

the second phase of this litigation.

Plaintiffs also assert that the doctrine of *res ipsa loquitor* applies. Article 2317.1

expressly provides that it does not preclude a court from applying this evidentiary

doctrine in an appropriate case. La. Civ. Code. Art. 2317.1. *Res ipsa loquitor* is a rule of

circumstantial evidence that applies when: "(1) the injury is of the kind which does not

ordinarily occur in the absence of negligence; (2) the evidence sufficiently eliminates

other possible causes of the injury, such as the plaintiff's own responsibility or the

responsibility of others; and (3) the alleged negligence of the defendant must fall within

the scope of his duty to the plaintiff, which will often be the case if the defendant had

exclusive control of the thing or situation that caused the injury to the plaintiff." *Linnear

v. CenterPoint Energy Entex/Reliant Energy*, 2006-3030 (La. 9/5/07), 966 So. 2d 36, 44.

If these requirements are met, then the doctrine "simply permits, but ordinarily does not

compel, the inference of negligence on the part of the defendant." *Garrett v. Air

Logistics, Inc.,* No. CIV. 95-2190, 1996 WL 109301, at *1 (E.D. La. Mar. 12, 1996)

(quoting *Fruge v. Penrod Drilling Co.,* 918 F.2d 1163, 1166 (5th Cir. 1990)).

Importantly, there is a significant limitation on *res ipsa loquitor*: it does not apply where direct evidence of a defendant's negligence is available to assist the plaintiff to present a prima facie case of negligence. *Linnear*, 966 So. 2d at 42; *accord McCann v. Baton Rouge Gen. Hosp.*, 276 So. 2d 259, 261 (La. 1973) ("Res ipsa loquitur is, of course, irrelevant when a body of direct evidence is available explaining the activity leading to the injury."). In this case, evidence was adduced regarding the advice IP received to replace the sight glasses on the Evaporator, the multiple opportunities IP had to act on this advice, and the company's failure to do so. There was also lay and expert testimony describing the factors that caused the sight glass to break. Given this evidence directly bearing on IP's negligence, the doctrine of *res ipsa loquitor* is unavailable. The Court observes that, if no direct evidence were available and the doctrine were therefore applicable, Plaintiffs could prove the three elements of *res ipsa loquitor*. First, black liquor generally does not discharge from a paper mill into the surrounding community without the occurrence of negligence. Second, the evidence demonstrates that the most likely cause of the accident is IP and not some third-party. Last, the Paper Mill's operations and equipment, including the sight glass that ruptured, were within the complete custody and control of IP. Thus, the alleged negligence was within the scope of IP's duty to Plaintiffs. But, again, *res ipsa loquitor* does not apply to this case in view of the direct evidence of negligence.

### E.  Louisiana Civil Code Article 667

Plaintiffs next assert claims under Louisiana Civil Code Article 667. This provision, titled "Limitations on use of property," is part of an area of the Louisiana civil law known as vicinage or the "obligations of neighborhood." 4 La. Civ. L. Treatise, Predial Servitudes § 3 (4th ed.).

Vicinage "imposes certain duties on landowners and occupiers of immovable property that are qualified in the Civil Code as 'legal servitudes' and as 'obligations' imposed by law independent of any agreement." *Collett v. Weyerhaeuser Co.*, No. CV 19-11144, 2020 WL 6828613, at *4 (E.D. La. Nov. 19, 2020) (cleaned up) (quoting Yiannapoulos, A.N., *Violations of the Obligations of Vicinage: Remedies Under Articles 667 and 669*, 34 LA. L. REV. 475, 476 (1974) [hereinafter *Obligations of Vicinage*]). Vicinage corresponds to a certain extent with common law nuisance but also differs in that nuisance derives from the common law of torts, while the legal servitudes underlying vicinage are "institutions of civil law property." *Id.* (citing *Obligations of Vicinage* at 489).

Article 667 originally stated: "[a]lthough a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him." La. Civ. Code art. 667 (amended 1996). Thus, Article 667 initially imposed a strict liability standard. *Yokum v. 615 Bourbon Street, L.L.C.*, 2007-1785 (La. 2/26/08), 977 So.2d 859, 874 (La. 2008). In 1996, the Louisiana Legislature enacted significant "tort reform" that curbed Article 667's strict liability regime. *See* 1996 La. Sess. Law Serv. 1st Ex. Sess. Act 1 (H.B. 18); *see also* Maraist, Frank and Galligan, Thomas, *Burying Caesar: Civil Justice Reform and the Changing of Louisiana Tort Law*, 71 TUL. L. REV. 339, 362-66 (1996) [hereinafter *Burying Caesar*]. The 1996 amendment generally supplanted strict liability under Article 667 with a negligence-based standard of liability, preserving strict liability only for certain "ultrahazardous" activities, namely, pile driving and blasting with explosives. *See* La. Civ. Code art. 667, as amended by La. Acts 1996, No. 1 (1st Extraordinary Session); *see also Brown v. Olin Chem. Corp.*, 231 F.3d 197, 200 (5th

Cir. 2000) (per curiam) (concluding that a claim under Article 667 "requires a showing of

negligence"). The additions to Article 667 contained in the 1996 amendment are bolded below:

> Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. **However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case. Nonetheless, the proprietor is answerable for damages without regard to his knowledge or his exercise of reasonable care, if the damage is caused by an ultrahazardous activity. An ultrahazardous activity as used in this Article is strictly limited to pile driving or blasting with explosives.**

La. Civ. Code art. 667 (2021).

Under the current version of Article 667, then, liability for damages under Article 667 for

activities that are not ultrahazardous requires proof of five elements: (1) a proprietor (2) who

performs "work" on her property (3) that causes damage (4) to a "neighbor" (5) when the

proprietor knew or should have reasonably known that his work would cause such damage but

fails to use reasonable care to prevent it (*i.e.*, negligence).[2] *See Alford v. Anadarko E&P Onshore*

*LLC*, No. 13-5437, 13-5703, 2015 WL 471596, *9 (E.D. La. Feb. 4, 2015).

Before analyzing whether Plaintiffs have satisfied the elements of their Article 667 claim,

the Court reviews the traditional relationship between Articles 667 and 2315 to determine

---

[2] Professors Frank Maraist and Thomas Galligan, Jr. point out that, while the 1996 amendment to Article 667 imposes a negligence standard for damages claims, the amendment does not dictate such a requirement for claims for injunctive relief to abate a proprietor's interference with a plaintiff's use and enjoyment of his property. *See Burying Caesar* at 336. Stated differently, it appears that plaintiffs claiming injunctive relief pursuant to Article 667 need not prove negligence as the Article's reference to unreasonable conduct applies only to damages claims. *See id.* Regardless, the proof required to obtain injunctive relief under Article 667 is no longer at issue in this case because Plaintiffs have dismissed their claims for such relief. R. Doc. 331.

whether a separate cause of action still exists under Article 667 or whether it has been absorbed entirely by Article 2315.

Twenty years before the 1996 tort reform package, the Louisiana Supreme Court commented in *Dean v. Hercules, Inc.* that a damages claim under "Article 667 is most closely associated with an action for damages based on C.C. 2315 et seq." 328 So. 2d 69, 72 (La. 1976). Even though the Articles create separate causes of actions, the *Dean* court stated that "a violation of Article 667 constitutes fault within the meaning of Article 2315." *Id.* Of course, the "fault" which the *Dean* court referred to in 1976 was broader than negligence given that a violation of Article 667 did not, at the time, require a showing of negligence but instead imposed strict liability. Despite the interrelationship between Articles 667 and 2315, the two remains conceptually distinct, stemming, as they do, from separate areas of the law. Furthermore, in distinguishing Articles 667 and 668, another vicinage provision, from Article 2315, the Fifth Circuit cited with approval the scholarship of the late Professor A.N. Yiannoupoulus, who wrote:

> the two sets of provisions may overlap in part but continue to establish distinct grounds of responsibility. Article 2315 establishes responsibility under the law of delictual obligations for all injuries to persons and property. Articles 667 and 668 establish specifically responsibility for damage to property and persons in the context of neighborhood, namely, under rules of property law. It is conceivable that liability may rest on either ground exclusively or on both cumulatively. Indeed, a plaintiff may satisfy the terms and conditions of both sets of Articles and may have two distinct causes of action for a single recovery, one resting on the precepts of the law of obligations and the other on precepts of the law of property; or he may have a cause of action either under Article 2315 or under Articles 667 and 668.

*Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 386 (5th Cir. 2001) (quoting Yiannopoulos, A.N., *Civil Responsibility in the Framework of Vicinage: Articles 667–69 and 2315 of the Civil*

*Code,* 48 TUL. L. REV. 195, 223 (1974)).[3] It is clear, therefore, that Article 667 may still serve as a separate basis of liability from Article 2315.

Now, turning to the components of a claim under Article 667, the first element is satisfied because IP's ownership and operation of the Paper Mill qualifies it as a "proprietor." *See Yokum*, 977 So. 2d at 874. The parties dispute the second element: whether the incident giving rise to this suit involved "work" performed by IP. Plaintiffs argue that, whether IP's "work" is conceived of broadly as making paper or, more narrowly, as refining black liquor, IP was performing "work" at the Paper Mill at the time of the rupture. R. Doc. 435 at 3-4.

IP frames the issue differently. IP agrees with Plaintiffs that its "work" is the manufacture of containerboard via a process that includes the use of a pressure vessel to concentrate the black liquor by-product. R. Doc. 425 at 4. But, IP argues, this "work" did not cause any harm to Plaintiffs. Rather, the activity Plaintiffs complain of is the one-time rupture of sight glass on the

---

[3] This pre-1996 amendment passage could be read to imply a practical, in addition to theoretical, distinction between Articles 667 and 2315: that liability can be based on one Article but not the other. This is certainly true when an injured party proves a claim under Article 2315; a plaintiff can establish negligence under Article 2315 without showing that she and the defendant are "neighbors" or that the defendant's "work" on his property caused her damage. Thus, a plaintiff who satisfies Article 2315 does not necessarily satisfy Article 667. Naturally, the question arises whether the converse is true—does satisfying Article 667 mean that a plaintiff *per se* prevails under Article 2315? The Court need not decide this question, although it appears the answer should be in the affirmative, or at least, it is the case that a plaintiff who establishes a claim under Article 667 necessarily prevails on a negligence claim under Article 2317.1. *See Yokum*, 977 So. 2d at 874 (stating that, following the 1996 amendment to Article 667, the Article incorporates a "negligence standard similar to that set forth in LA. C.C. art. 2317.1" (internal footnote omitted)).

From a practical perspective, one may wonder why a plaintiff would ever pursue a claim under Article 667 if she simply seeks damages for negligence—as opposed to an injunction or damages based on strict liability for ultrahazardous activities under Article 667—when a damages remedy is available under Articles 2315 and 2317.1. Plaintiffs posit two reasons relating to damages. First, they contend that property owners who suffer interference with their enjoyment of their property due to a neighbor's conduct may obtain damages for their inconvenience that are not available to a plaintiff who proceeds only under Article 2315. R. Doc. 488 at 14. Put differently, Plaintiffs suggest that Article 667 provides a broad damages remedy that covers loss of enjoyment of property—a remedy Plaintiffs believe falls outside of the scope of damages for economic loss and emotional distress that are recoverable under Article 2315. Second, Plaintiffs assert that the burden of proving damages owing to a violation of Article 667 is lighter than the burden of establishing damages under Article 2315. *Id.* at 16. The Court need not weigh in on Plaintiffs' contentions at this time because the types of damages available and the proof thereof are Phase II issues and thus not presently before the Court.

Evaporator—an incidental, "secondary event" that, although stemming from IP's operations, actually forced IP to shut down the Evaporator and thereby interrupted IP's "work" of producing paper. *Id.* at 4-5. Such an unintended occurrence, IP contends, does not constitute "work."

   "[T]he work to which Article 667 refers includes . . . activities that may cause damage." *Yokum*, 977 So. 2d at 875. Article 667 does not define "work," but it is evident that the term embraces a proprietor's activities that unintentionally cause damage by failing to proceed as planned or to achieve their desired result. *See, e.g.*, *Smith v. Town of Logansport*, 395 So. 2d 888, 890 (La. Ct. App. 1981) (holding that a municipality was engaged in the "work" of providing drinking water when a water line it owned and operated burst, causing damage to neighboring property); *Kenner Plumbing Supply, Inc. v. Rusich Detailing, Inc*., 14-922 (La. App. 5 Cir. 9/23/15), 175 So. 3d 479, 488 (upholding liability under Article 667 against automobile repair shop after fire accidentally started due to the heating of vehicles' plastic bumpers by shop employees). Excluding from the definition of "work" an activity where a malfunction or mishap occurs would insulate businesses from liability under Article 667 for their operational failures and would be contrary to the provision's intent to impose liability on proprietors for their damage-causing activity. Where a proprietor is engaged in an activity that is part of its business or function and the activity or operation fails—even on just one occasion—the proprietor is still involved in "work" within the meaning of Article 667. The inquiry under the provision is whether a proprietor's activity or structure on its estate results in damage to a neighbor, not whether the proprietor's damage-causing activity occurred inadvertently. *See Mut v. Newark Ins. Co.,* 289 So. 2d 237, 244 (La. Ct. App. 1973)  (holding that "Article 667 [applies] to all instances wherein an activity, work, structure or building on an owner's property causes unwarranted damage to neighboring property"); *Alford v. Anadarko E&P Onshore LLC*, No. CIV.A. 13-5457,

25

2015 WL 471596, at *9 (E.D. La. Feb. 4, 2015) (holding that Article 667 requires plaintiffs to "allege that defendants, as proprietors, made some work or conducted some activity on the property that caused plaintiffs to suffer damages").

IP cites *Villaronga v. Gelpi Partnership Number 3*, for the proposition that Article 667 does not apply to a "secondary event" from a defendant's work. R. Doc. 425 at 4 (citing 536 So.2d 1307, 1311 (La. Ct. App. 1988)). In that case, a fire arose from the site of an apartment building that was under construction, causing substantial damage to an adjacent apartment complex. *Villaronga*, 536 So.2d at 1309. Tenants in the damaged apartment complex sued the owner of the neighboring apartment building under construction, contending that the owner was liable for the damage under Article 667. *Id.* at 1311. The Louisiana Fifth Circuit Court of Appeals rejected this argument, reasoning that the owner's construction was not the "work" that damaged the neighboring apartment complex; "rather, it was the fire which caused the damage." *Id.* Notably though, the source of the fire—whether an arsonist or a plumber's torch—was disputed. Indeed, the appeals court reversed the trial court for usurping the jury's function by making a credibility determination that it was equally probable that the fire was started by an arsonist as by a plumber. *Id.* at 1310. Thus, it was uncertain in *Villaronga* whether the construction work did in fact cause the fire. Understood in this context, the *Villaronga*'s statement that the construction was not the "work" that caused the fire makes sense because the jury had not determined the cause of the fire. *Villaronga* therefore does not support IP argument that incidental events resulting from a defendant's work cannot give rise to liability under Article 667.

Similarly inapposite is IP's citation to *Westridge v. Poydras Props.*, 598 So. 2d 586 (La. Ct. App. 1992). There, arson started a fire in a commercial building that was under renovation.

*Id.* at 588-90. The fire caused damage to the building owner's tenants who sued the owner under Article 667. A Louisiana appeals court held that Article 667 did not apply because the owner's renovation work did not cause damage to the tenants; instead, it was the fire, initiated by a third-party's acts of arson that were in no way part of the renovation project, that caused the damage. *See id.* at 589 (citing *Terre Haute Plantation, Inc. v. Louisiana & A. Ry. Co.*, 210 So. 2d 566, 568 (La. Ct. App. 1968) (holding that railroad company was not liable for property damage to plaintiff's crops from a fire that originated on railroad's right of way and occurred near the railroad's depot because there was no evidence that the railroad's activity caused the fire; "[t]o hold otherwise would cast liability on every landowner on whose property a fire is commenced and spread to neighboring lands even though the cause or origin of the fire was due to the act of trespassers, vandals, lightning or unknown sources not attributable to any conduct or activity on the part of the landowner")).

Unlike the cases IP cites, there is, of course, no evidence in this case that a third-party caused the sight glass to malfunction. And where the facts show that a building owner's own activities on its estate inadvertently cause damage to a neighbor, Louisiana courts have imposed liability under Article 667. *See, e.g.*, *Kenner Plumbing Supply, Inc.*, 175 So. 3d at 488. More fundamentally though, whether a fire stemming from the construction of a building constitutes "work" under Article 667 is a very different question than whether a paper mill is engaged in "work" when it is carrying out steps that are essential to its paper-making process and those very activities result in a foreseeable, though unintended, incident. Only the latter question is presented here, and the Court concludes that IP's activities giving rise to the rupture fall comfortably within the meaning of "work" under Article 667.

At trial, David Villarrubia explained that black liquor is a by-product of the paper-making process. It is produced when the Paper Mill cooks woodchips with chemicals in order to transform the woodchips into pulp. The black liquor is then directed through the Paper Mill's 8-Effect Evaporator. During this process, heat is applied to remove water from the black liquor so that the black liquor can be concentrated and eventually reused as fuel in the process of cooking woodchips. Use of the Evaporator in this manner is an integral part of the process the Paper Mill employs to manufacture containerboard liner. The incident at issue in this case—the rupture of the sight glass on the Third Effect of the Evaporator—occurred while IP was engaged in the process of concentrating black liquor through the Evaporator. In other words, the rupture occurred as a result of IP conducting a key part of its business operations. IP's activities thus caused the incident *sub judice*. *See Smith*, 395 So. 2d at 890; *Kenner Plumbing Supply, Inc.*, 175 So. 3d at 488. This, as explained, is not a case like *Villaronga*, 536 So.2d at 1309, or *Westridge*, 598 So. 2d 586, where the damage-causing incident could have resulted from the independent actions of a third-party. Finally, the caselaw refutes IP's suggestion, R. Doc. 425 at 5, that a one-off occurrence cannot amount to an actionable claim under Article 667. *See Fontenot v. Magnolia Petroleum Co*., 80 So. 2d 845, 850 (1955) (blasting incidents on single date sufficient to establish liability under Article 667); *Gotreaux v. Gary*, 94 So. 2d 293, 374-76. (La. 1957) (holding rice farmer liable under Article 667 for damage to neighbor's cotton crop caused by a single episode where rice farmer hired crop-dusting company that sprayed herbicides, killing some of neighbor's cotton); *Smith*, 395 So. 2d at 890; *Kenner Plumbing Supply, Inc.*, 175 So. 3d at 488.

Having concluded that the IP was engaged in "work" that allegedly caused damage to Plaintiffs, the Court addresses the other elements of an Article 667 claim. At this stage, the Court

cannot determine the third element of this claim—whether the rupture of the sight glass caused damage to any particular Plaintiff; that requires an individualized, plaintiff-by-plaintiff factual inquiry that must await the second stage of this litigation.

Next, the Court discusses whether Plaintiffs are "neighbors" within the meaning of Article 667. Again, that provision limits those who can bring damages claims to "neighbor[s]" of the proprietor whose work causes injury. La. Civ. Code art. 667. The Fifth Circuit has held that to be "a 'neighbor,' and thus legally entitled (standing; right of action) to maintain an art. 667 action, a plaintiff must show some type of ownership interest in immovable property near that of the proprietor." *Roberts*, 266 F.3d at 387.[4] This class action comprises "all persons or entities who were physically present or owned property" within a defined geographic boundary on June 10, 2015, and who suffered injuries from the discharge of black liquor from the Paper Mill. R. Doc. 226 at 17-18. Insofar as any class member lacks an ownership interest in immovable property near the Paper Mill, that Plaintiff does not have a cause of action under Article 667. *See id.* Their claims are governed by Articles 2315, 2317, and 2317.1.

As to class members who held an ownership interest in immovable property within the geographic boundaries of the class on June 10, 2015, the issue is whether all of these class members are, as a matter of law, "neighbors" of IP under Article 667. The Louisiana Civil Code requires that words "be given their generally prevailing meaning." La. Civ. Code art. 11. The

---

[4] Technically, under Article 667, a plaintiff need not have an ownership interest in a neighboring property; rather, the provision extends to "leasehold interest, third-party interest, or more generally the interest of 'a person whose right derives from the owner.'" *Ictech-Bendeck.*, No. CV 18-7889, 2019 WL 4111681, at *3 (quoting *Yokum*, 977 So. 2d at 874). However, the class here has been defined to include those persons or entities who "were physically present or *owned* property" within the class's geographic scope at the time of the incident. R. Doc. 226 at 17-18. Under this definition of the class's compositions, for an individual Plaintiff to have a viable claim under Article 667, she must either have an ownership interest in immovable property within the class's physical boundaries or have been physically present within the boundaries of the class at the time of the incident and have any other legal interest—such as a leasehold—in an immovable located within the relevant area.

ordinary meaning of "neighbor" is a person who lives near another. *TS & C Invs., L.L.C. v. Beusa Energy, Inc.*, 637 F. Supp. 2d 370, 382 (W.D. La. 2009).  The Fifth Circuit has required that there be "*some* degree of propinquity" for parties to be neighbors. *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 731 (5th Cir. 2017); *see also Barasich v. Columbia Gulf Transmission Co.*, 467 F. Supp. 2d 676, 690 (E.D. La. 2006) ("Plaintiffs ask for a finding of liability between parties whose properties are hundreds of miles apart in many cases. If these parties could be held to be neighbors, the restrictive meaning of the statutory language would be eviscerated."). On the other hand, the Fifth Circuit and Louisiana appeals courts have commented that "[t]he word 'neighbor' as used in Article 667 is indefinite and refers to any landowner whose property may be damaged irrespective of the distance his property may be from that of the proprietor whose work caused the damage." *Roberts*, 266 F.3d at 386 (cleaned up) (quoting *Gulf Ins. Co. v. Emp'rs. Liab. Assurance Corp.,* 170 So. 2d 125, 129 (La. Ct. App. 1965)). Despite courts' somewhat inconsistent descriptions of "neighbor," it is evident that being a neighbor does not require that one "be an adjoining landowner." *Id.*

Whether a landowner is a "neighbor" under Article 667 is fact specific but may be decided on a class-wide basis. *See Ictech-Bendeck v. Progressive Waste Sols. of LA, Inc.*, No. CV 18-7889, 2019 WL 4111681, at *3-*4 (E.D. La. Aug. 29, 2019). In light of this context-dependent inquiry, courts have reasoned that the degree of proximity required for parties to be neighbors "may change based on the harm alleged (for example, the radius of neighbors surrounding a loud manufacturing plant may be much smaller than the radius of neighbors surrounding a nuclear waste facility)." *Id.* at *3; *see also In re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d 644, 734 (E.D. La. 2009), *rev'd in part on other grounds sub nom. In re Katrina Canal Breaches Litig.*, 696 F.3d 436 (5th Cir. 2012) (holding plaintiffs living three miles

away from the property allegedly causing the nuisance were not neighbors because the distance was "too attenuated" for the type of harm alleged—flood damage).

In *Ictech-Bendeck v. Progressive Waste Sols. of LA, Inc.*, a court in this District held that plaintiffs adequately alleged they were neighbors of a landfill where plaintiffs had interests in properties in three different municipalities in the same parish and all alleged that they were adversely affected by noxious odors emitted from a landfill. No. CV 18-7889, 2019 WL 4111681, at *4 (E.D. La. Aug. 29, 2019). By contrast, one federal court in Louisiana held that a plaintiff was not the neighbor of a property located over 5 miles away where plaintiff's unusual theory of liability was "based on underground migration of an enormous toxic plume potentially impacting several non-adjacent landowners." *Ashworth v. Int'l Paper Co.*, No. 2:20-CV-00053, 2020 WL 4043186, at *4 (W.D. La. July 17, 2020). Likewise, another Louisiana federal court sitting in diversity determined that businesses located twenty miles from the site of an oil well blow out were not neighbors in relation to the defendant-well owner. *TS & C Invs., L.L.C*, 637 F. Supp. 2d at 383 (W.D. La. 2009).

In this case, the geographic scope of the class is fairly limited. The perimeter of the class's geographic boundary encompasses the area surrounding the Paper Mill in which the deposition level of black liquor was at least 0.1 grams per square meter. R. Doc. 266 at 15-16. Applying this criterion, the Court, after a visit to the area with counsel, drew the class's physical boundaries as set forth in the Order redefining the class. *Id.* Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the fact that any immovable property within the class's physical confines lies, at most, approximately 3 miles from the Paper Mill. Plaintiffs' immovable property therefore is relatively proximate to the Paper Mill. *See Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E.*, 850 F.3d at 731.

Given the definition of the class's physical boundaries, all immovables within this area were exposed to an appreciable level of black liquor deposit. Accordingly, all Plaintiffs with an interest in an immovable situated within the class's physical boundaries may have suffered damage due to exposure to black liquor. The Court finds that this possibility of actual injury due to a proprietor's activity relevant to the analysis of whether Plaintiffs are "neighbors" of IP. *See Ictech-Bendeck*, 2019 WL 4111681, at *4; *In re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d at 734 (E.D. La. 2009). Additionally, Plaintiffs' theory that they were injured due to exposure to chemicals—in this case, black liquor—that dispersed into the atmosphere and traveled onto their property is a prototypical type of nuisance claim. Thus, there is no concern here that deeming Plaintiffs to be neighbors of IP may ill-advisedly extend Article 667 to claims not traditionally conceived of as sounding in nuisance. *See Ashworth*, 2020 WL 4043186, at *4.

Taking into account these factors, the Court concludes that, whether it applies the "*some degree of propinquity*" standard for determining who is a neighbor under Article 667, *Bd. of Comm'rs*, 850 F.3d at 731, or the broader definition of neighbor, which includes as a neighbor any landowner who experiences damages to his immovable property due to a proprietor's work, *Roberts*, 266 F.3d at 386; *Gulf Ins. Co.,* 170 So. 2d at 129, all class members with a proprietary interest in immovable property within the geographical boundaries of the class on June 10, 2015 constitute neighbors under Article 667.

The final element of Plaintiffs' Article 667 claim requires them to show that IP was negligent in its operations. The Louisiana Supreme Court has, as mentioned, analogized this negligence inquiry to the one conducted under Article 2317.1. *See Yokum*, 977 So. 2d at 874. This Court has already explained its analysis of Plaintiffs' claims under Article 2317.1. For the

reasons the Court finds IP negligent under that codal provision, the Court likewise finds IP negligent under Article 667.

In brief, IP knew or should have known to replace the sight glasses on the Third Effect based on recommendations from trusted sources, both internal and external to the Paper Mill; IP could have replaced those sight glasses with new sight glasses or steel blanks that were readily available from the Paper Mill's inventory; IP had numerous opportunities to install new sight glasses or steel blanks while causing minimal to no disruption to the plant's operations, including during the annual outages from 2013-2015 and the electrical outage in June 2015; IP could have completed the installation in a matter of minutes; IP knew that if a sight glass were to fail, the black liquor in the Evaporator could be discharged and released into the air given the pressure in the Evaporator; and it was foreseeable that black liquor released into the air could travel outside the confines of the Paper Mill and harm the surrounding community. Under these circumstances, a prudent operator would have replaced the sight glasses on the Third Effect. IP did not. It was therefore negligent under Article 667.[5]

## III.   CONCLUSION

The Court summarizes its holdings as follows:

1. All class members have adequately established the following elements of their claims under Article 2315: (1) IP had a duty to conform its conduct to a specific standard of care (the duty element); (2) IP's conduct failed to conform to the appropriate standard of care (the breach element); (3) IP's substandard conduct was a legal cause of Plaintiffs' injuries (the scope of liability element). Whether IP's substandard conduct was a cause-in-fact of individual

---

[5] Although Article 667 authorizes courts to apply the doctrine of *res ipsa loquitur*, La. Civ. Code art. 667, the doctrine is inapplicable here because, as explained in the Court's discussion of Article 2317.1, *see supra* Section II.D., this case involves direct evidence of IP's negligence.

Plaintiffs' injuries (the cause-in-fact element) and whether Plaintiffs suffered actual damages (the damages element) will be decided at the second stage of this case.

2. All class members have adequately established the following elements of their claims under Articles 2317 and 2317.1: (1) IP had custody of the Paper Mill; (2) the Paper Mill contained a defect that created an unreasonable risk of harm; and (3) IP knew or should have known of the defect at the Paper Mill. Whether the defect was the cause of the harm will be adjudicated at the next phase of this case.

3. All class members have adequately established the following elements of their claims under Article 667: (1) IP was a proprietor of the Paper Mill; (2) IP's activities at the Paper Mill that gave rise to the incident constitute "work" within the meaning of Article 667; (3) all class members with (a) an ownership interest in immovable property within the geographic scope of the class on June 10, 2015, as the Court has most recently defined its physical boundaries, R. Doc. 266, and (b) all class members who were physically present within the class's geographic area at the time of the incident and hold a legally recognized interest in immovable property in the subject area, are "neighbors" as contemplated by Article 667; (4) IP knew or should have known that its work would cause damage to Plaintiffs but failed to exercise reasonable care to prevent the damage. Whether IP's conduct actually caused damage to particular Plaintiffs as well as the amount of those damages, if any, will be resolved at phase two of this case.[6]

---

[6] All pretrial evidentiary motions are denied as moot. *See* R. Docs. 414-15, 446.

New Orleans, Louisiana, on this 3rd day of January, 2022.


**UNITED STATES DISTRICT JUDGE**